**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Larry BENTLEY, Defendant–Appellant.**

No. 93–4134.

United States Court of Appeals,
Sixth Circuit.

Argued May 6, 1994.

Decided July 20, 1994.

Dana M. Peters (argued and briefed), Office of the U.S. Atty., Columbus, OH, for plaintiff-appellee.

Richard A. Cline (argued and briefed), Mitchell, Allen, Catalano & Boda, Columbus, OH, for defendant-appellant.

Before: JONES, RYAN, and BATCHELDER, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Defendant-Appellant Larry Bentley was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), and knowingly receiving, concealing, or storing a stolen firearm in violation of 18 U.S.C. §§ 922(j) and 924(a)(2). He was sentenced under 18 U.S.C. § 924(e) for possession of a firearm having previously been convicted of three or more violent felony offenses. He appeals his conviction on Fourth Amendment grounds, contending that the evidence against him was uncovered pursuant to an illegal search and seizure. He also appeals his sentence, contending that two of his three underlying convictions do not qualify as violent felonies.

Because we find that, under our precedents, the search and seizure was reasonable, we affirm Bentley's conviction. However, because we also find that one of Bentley's underlying convictions was not a violent felony, we hold that § 924(e) is inapplicable. Therefore, we vacate Bentley's sentence and remand for resentencing.

I.

On April 13, 1992, an unidentified citizen—a local businessman to whom the parties refer as "the source"—called the Bureau of Alcohol, Tobacco & Firearms ("ATF") to report that an unidentified person had just telephoned the source offering to sell 150 new Smith & Wesson handguns. Because the caller's asking price was between $7,000 and $8,000, and the fair market value of 150 new handguns would have been more than $25,000, the source suspected that the caller's guns were stolen.

The source spoke with ATF Agent Don Mapley. Mapley had spoken to the source before, and knew him to be knowledgeable about firearms, but the source had never before acted as an informant. Mapley and ATF Agent Rodney Russell went to the source's place of business, hoping in vain that the caller would call back or show up while they were present. The agents spoke to the source for two hours and decided that he was credible. Russell gave the source his pager number so that the source could contact Russell quickly if the caller contacted the source again.

On April 14, 1992, the agents tried to verify the theft of 150 new handguns. They were unable to do so at that time. On April 15, 1992, the source paged Russell, and informed him that the caller was at the source's place of business with the guns. Russell drove immediately to the source's place of business. While he was en route, the source called the ATF office and reported that: the would-be gun seller had just left to get more guns and would return shortly; the seller was an African–American male driving a 1992 green and tan Ford Explorer with Ohio license plate number KEA–366; a female passenger was in the vehicle; the guns were in boxes that were in green garbage bags in the back of the vehicle; and the vehicle was traveling north on Westerville Road toward Schrock Road.

Mapley, in an unmarked car, drove to Schrock Road, and found the Explorer parked at 6659 Concourse Loop Road. After a short wait, the vehicle left its parking place, driven by an African–American male later identified as Bentley, along with a pas-

senger later identified as Linda Ramos. Mapley followed the Explorer as it drove *past* the source's business. Mapley believed then that he had probable cause to stop the vehicle. At Mapley's order, unmarked ATF vehicles pulled in front of and behind the Explorer, forcing it to stop. Marked police cruisers followed right behind. At least two agents approached the Explorer with guns drawn and ordered Bentley and Ramos to get out. Bentley and Ramos were immediately searched, handcuffed, and placed in the back of a police cruiser. ATF Agent Dave Taylor then observed, in plain view, Smith & Wesson firearm boxes inside a partially open green garbage bag on the floor of the passenger's seat. Mapley noticed a second green garbage bag in the rear of the vehicle. The agents searched the vehicle and found three new handguns in one of the garbage bags and six new handguns in the other.

Shortly thereafter, Bentley admitted that he had more guns in his apartment at 6659 Concourse Loop Road, and gave the agents permission to search there. The agents found another 109 guns in the apartment. The agents later learned that all of the guns had been stolen from Smith & Wesson.

Bentley subsequently moved to suppress the weapons seized during the searches of his car and apartment. After the district court denied the motion, Bentley entered a conditional guilty plea, reserving the right to appeal both the denial of the motion to suppress evidence and the applicability of the sentencing enhancement provision of § 924(e). Bentley had previously been convicted of aggravated robbery, and two separate charges of breaking and entering under Ohio law; he argued that the latter two convictions were not "violent felonies" within the meaning of § 924(e).

Bentley was sentenced to 190 months in prison plus 5 years of supervised release. He now appeals his sentence and the denial of his motion to suppress.

## II.

### A.

■ Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances. "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (quoting *Terry*, 392 U.S. at 29, 88 S.Ct. at 1883–84). It is well settled that the *Terry* doctrine applies to investigative stops of a moving automobile. *See, e.g., Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *United States v. Hardnett*, 804 F.2d 353, 355–58 (6th Cir.1986) (applying *Terry* doctrine to police officer's forced stop of a car), *cert. denied*, 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987).

In the present case, the parties agree that the ATF agents lacked probable cause when they stopped the Explorer. The government argues, however, that the agents had a reasonable suspicion that justified the initial stop, and that the Smith & Wesson boxes in plain view sufficed to justify a full search of the vehicle. By not arguing that the agents had probable cause at the time of the initial stop, the government implicitly concedes that the agents erred by arresting Bentley and Ramos prior to conducting the search.

Bentley does not dispute that once the agents saw the gun boxes in plain sight, the search of the car became permissible. Rather, Bentley treats the stop, the arrest, and the subsequent search as one collective action that must be supported by probable cause in order to be constitutional. However, our precedents indicate that these three acts should be considered separately. Granted that handcuffing Bentley and Ramos and placing them in a police cruiser constituted a premature arrest, this wrongful act would be relevant to Bentley's motion to suppress the guns found in the Explorer only if the officers searched the vehicle as a mere incident of the arrest. The government does not attempt to justify the search of the car on this basis. Rather, it argues that: (1) the initial stop was constitutionally permissible under *Terry* and its progeny, (2) the discov-

ery of the Smith & Wesson boxes was permissible under the plain view doctrine, and (3) the subsequent search of the vehicle was justified by the discovery of the incriminating gun boxes.

We agree with the government and find that the premature arrest played no role in the seizing of the evidence from the Explorer. It follows that the fact that the arrest was premature is not grounds for the suppression of the evidence.

### B.

■ Bentley also argues that the agents lacked reasonable suspicion to justify their forced stop of the Explorer. He points out that: Bentley and Ramos had not committed any traffic violation that could justify the stop; the agents had no specific information that the weapons allegedly contained in the Explorer were stolen; they had no knowledge that Bentley was a felon; the source had no history of reliability as an informant; and the agents had already seen that the source had falsely predicted that Bentley would return to the source's place of business.

However, the source's information had already been verified to a significant extent. The agents had already verified that the source had accurately described the vehicle, its passengers, and the direction in which it was going. As the court below explained:

> With each confirmation of the specific nature of the tip, the reliability of the tip increased. Because of the actual verifications, it became reasonable for the officers to determine that the anonymous tip was reliable. Thus, the officers had reasonable grounds to believe that the remaining, but unverified, bit of the tip—that the Defendants were in possession of stolen firearms—was indeed true and accurate.

J.A. at 28 (Order denying Defendants' Motion to Suppress). We agree with this analysis.

Moreover, although the record does not reveal the source's identity, the source was not anonymous to the ATF agents. Mapley already knew the source personally and believed him to be credible. Russell had spo-

ken with the source for at least two hours. In this respect, the present case is similar to *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972) (holding that, where a police officer acted on the unverified tip of an informant whom the officer knew personally, "the information carried enough indicia of reliability to justify the officer's forcible stop" of the defendant).

Bentley stresses that, unlike the informant in *Adams,* the source had predicted incorrectly that Bentley would come back to the source's place of business. However, given that Mapley and Russell already knew the source personally, and had already confirmed some of the source's information, we find that this one discrepancy does not make the initial stop unreasonable.

### III.

Under § 924(e), one who violates § 922(g) after previously having been convicted of three or more "violent felonies" is subject to an enhanced sentence. The term "violent felony" is defined in § 924(e)(2)(B) as any crime punishable by imprisonment for a term exceeding one year that:

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

> (ii) is burglary, arson or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

In *Taylor v. United States,* 495 U.S. 575, 599, 110 S.Ct. 2143, 2158–59, 109 L.Ed.2d 607 (1990), a unanimous Supreme Court clarified that the statute refers not to common law burglary, but to "generic burglary," which includes "any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure with intent to commit a crime." The Court held that, to determine whether a prior conviction is a violent felony under § 924(e), a court should not engage in a detailed analysis of the particular facts underlying the prior conviction. Rather, "§ 924(e) mandates a formal categorical approach, looking only to the statutory definitions of the prior offenses,

and not to the particular facts underlying those convictions." *Id.* at 600, 110 S.Ct. at 2159. The Court explained that there is an exception to this general rule; when a statute prohibits a broader range of conduct than generic burglary, a sentencing court may "go beyond the mere fact of conviction in a narrow range of cases where a jury was actually required to find all the elements of generic burglary." *Id.* at 602, 110 S.Ct. at 2160. In such cases, the court may also look to "the charging paper and jury instructions." *Id.*

The parties agree that Bentley's previous aggravated robbery conviction is a violent felony as defined by § 924(e)(2)(B). They disagree, however, as to whether Bentley's two breaking and entering convictions count as violent felonies. Ohio's "breaking and entering" statute provides that:

(A) No person[,] by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense ... or any felony.

(B) No person shall trespass on the land or premises of another, with purpose to commit a felony.

Ohio Rev.Code Ann. § 2911.13. The Legislative Committee Comment to the statute explains that "[b]ecause of the comparatively low risk of personal harm, an offense under this section is viewed as the least serious in the hierarchy of breaking and entering offenses in the new code."

From the statute's face, it is obvious that one cannot break and enter in violation of § 2911.13(A) without unlawfully entering or remaining in a building or structure. It follows that violating § 2911.13(A) is a "generic burglary" as defined in *Taylor.* However, it is equally clear from the statute's face that one can break and enter in violation of § 2911.13(B) without unlawfully entering or remaining in a building or structure. It follows that violating § 2911.13(B) is not a "generic burglary" as defined in *Taylor.*

Furthermore, one can certainly trespass on land with the intent to commit a felony without attempting or threatening to use any form of physical force. Thus, a violation of § 2911.13(B) does not qualify as a violent felony under the first prong of § 924(e)(2)(B). Finally, from the Legislative

Committee Note it is clear that breaking and entering, without more, does not "otherwise involve[ ] conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B)(ii). Thus, a violation of § 2911.13(B) is not a violent felony under the second prong of § 924(e)(2)(B). *But see United States v. Palmer,* 871 F.2d 1202, 1208–09 (3d Cir.) (pre-*Taylor* case, holding that a particular defendant's violation of Ohio's breaking and entering statute constituted a burglary and involved a potential risk of physical injury to another; because the *Palmer* court analyzed defendant's particular behavior rather than the statutory elements in abstract, its reasoning is no longer valid in light of *Taylor* ), *cert. denied,* 493 U.S. 890, 110 S.Ct. 233, 107 L.Ed.2d 185 (1989).

■■ Bentley received an enhanced sentence pursuant to § 924(e) on the basis of his three previous felony convictions: one for aggravated robbery in violation of Ohio Rev. Code Ann. § 2911.01; a second for breaking and entering an unoccupied structure in violation of § 2911.13(A); and a third for breaking and entering by trespassing "on the land or premises" of another in violation of § 2911.13(B). *See* J.A. at 74–84. The parties agree that the first of these convictions was for a violent felony within the meaning of § 924(e). We agree with the government that the second conviction constitutes a generic burglary as per *Taylor,* and so it, too, constitutes a violent felony. However, we agree with Defendant that a violation of § 2911.13(B) is not a violent felony and cannot serve as an underlying offense justifying the application of an enhanced sentence pursuant to § 924(e).

The government argues to the contrary, asserting that the instant case should be governed by *United States v. Fish,* 928 F.2d 185, 187 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 115, 116 L.Ed.2d 84 (1991), in which the court held that Michigan's "breaking and entering" law involved "generic burglary" under *Taylor.* However, this statute specifically criminalized breaking and entering into various structures: "tent, hotel, office, store, shop, warehouse, barn, granary, factory, or other building, structure, boat or

ship, railroad car or any private apartment in any such of buildings or any unoccupied dwelling house." *Id.* at 188 (quoting Mich. Comp. Laws Ann. § 750.110). In contrast, the Ohio statute criminalizes "trespass on land" in addition to the entering of a structure.

■ The government also argues that under the particular circumstances of Bentley's 1989 indictment and guilty plea, he actually did enter a structure rather than merely trespass on land. But here, the record of Bentley's 1989 conviction consists only of the indictment, which charged Bentley with "trespass on the land or premises of WESTERN SIZZLEN STEAK HOUSE, with purpose to commit a felony," and the entry of judgment on the guilty plea describing the crime as breaking and entering. J.A. at 82–84. The similarity of the language of the indictment to the language of § 2911.13(B) demonstrates that, had Bentley not pled guilty, the jury would not necessarily have had to find the elements of generic burglary in order to convict him. Under *Taylor*, then, we do not inquire into the specific circumstances of the past convictions, but rather we decide the issue based solely upon the statutory definitions of the prior offenses.

Finally, the government argues that breaking and entering under Ohio law presents a serious potential risk of physical injury to another. We find this contention to be implausible, for mere trespass to unoccupied land is unlikely to lead to a violent confrontation. Moreover, the Legislative Committee Note shows that the Ohio legislature explicitly disagreed with the government's position.

### IV.

For the foregoing reasons, we affirm the lower court's denial of Bentley's motion to suppress evidence, but we vacate Bentley's sentence and remand for resentencing without the application of the enhancement provisions of § 924(e).