OPINION
Defendant-appellant, Jerimiah Holloway, was indicted on one count of possession of marijuana, a violation of R.C. 2925.11. Holloway's motion to suppress, alleging that the evidence was seized in violation of his constitutional rights, was overruled. Following a jury trial, appellant was found guilty of possession and sentenced to eight years incarceration.
Within days of his conviction, Holloway appeared for sentencing on an unrelated charge of attempt to carry a concealed weapon. Holloway had pled guilty to the weapon charge, but sentencing on that charge had been postponed pending the outcome of the drug case. Holloway moved to withdraw his guilty plea on the weapon charge. The trial court denied as untimely Holloway's motion to withdraw the plea and imposed an eight-month jail sentence for the weapon charge.
In this consolidated appeal, Holloway assigns the following seven errors:
 I. THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT BY OVERRULING DEFENDANT'S MOTION TO SUPPRESS.
 II. THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT BY SENTENCING DEFENDANT TO A TERM OF INCARCERATION UNSUPPORTED BY THE JURY'S VERDICT.
 III. THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT BY OVERRULING DEFENDANT'S OBJECTIONS TO JURY INSTRUCTIONS.
 IV. DEFENDANT'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 V. THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT BY REFUSING TO ALLOW THE DEFENDANT TO WITHDRAW HIS ALFORD PLEA TO THE ATTEMPTED CARRYING CONCEALED WEAPON CHARGE.
 VI. DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.
 VII. THE CUMULATIVE EFFECT OF ERROR DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.
For the reasons that follow, we overrule Holloway's assignments of error and affirm the judgment of the trial court.
The following evidence was offered at the suppression hearing and at Holloway's drug possession trial. On November 3, 1998, Barry Williams checked two items of luggage at the Los Angeles International Airport on Northwest Airlines flight No. 1024 to Columbus, Ohio via St. Paul, Minnesota. The flight was scheduled to arrive in Columbus at 5:20 p.m. Although the bags made it onto the plane, Williams missed his flight. He took a later flight and arrived in Columbus four hours after his luggage.
The original Northwest Airlines flight touched down in Columbus a few minutes before its scheduled 5:20 arrival time. All luggage from the Northwest Airlines flight, including Williams' bags, was subjected to a canine inspection at the Port Columbus International Airport. Detective Donald White and Agent Amy Allen, drug enforcement officers, were located in an area behind the general baggage claim concourse, handling a dog that had been trained to alert to the smell of narcotics. Although the dog did not alert to any of the bags from the Los Angeles flight, one of the bags attracted Detective White's attention. Detective White noticed that the bag, a black roller variety, appeared to be brand new and that it had no name tag. Detective White thought the bag had "characteristics of somewhat of [sic] a known drug courier type bag." (Tr. 6.)
Detective White called some other officers who were working outside in the general baggage claim area so they could watch the bag as it came out on the carousel. Detective White then joined the other officers in the baggage claim area. The other officers told Detective White that they had been watching Holloway because he had been looking suspiciously at the luggage on the carousel, seemingly not knowing which bags to pick. Holloway eventually picked up two black bags, including the one that Detective White had spotted.
Detective White and Agent Allen approached Holloway as he was walking out of the baggage claim area. The officers, who were dressed in casual civilian clothing, displayed badges and identified themselves as narcotics agents. They did not display weapons or touch Holloway, and they did not block his path. In a conversational tone, Detective White asked if Holloway would mind talking to the officers. Holloway dropped the bags and said, "no, what for." (Tr. 9.)
In response to questions from Detective White, Holloway said that he was at the airport with his uncle and that the bags belonged to his uncle. Holloway said that his uncle was inside the double exit door area. Detective White testified that Holloway was acting a little nervously. Holloway backed through the first set of doors as he was indicating that his uncle was inside. Once he got inside the double doors, however, Holloway ran, leaving the bags behind.
A chase ensued, and Holloway was eventually apprehended in the ticketing area by Detective White and two uniformed officers. Holloway was escorted to a conference room in the airport baggage area, approximately three hundred or four hundred yards from the place of apprehension. Detective White read Holloway his Miranda rights once he was seated in the closed conference room, and Holloway signed a waiver. Detective White then asked Holloway if he would mind if the officers looked in the bags. Holloway responded: "No, I don't mind at all because they don't belong to me." (Tr. 16.) The locked bags were pried open in Holloway's presence. Both bags appeared to contain drugs that had been packaged in cellophane and wrapped in baby blankets. The officers then informed Holloway that he was under arrest for possession of narcotics.
Detective White patted him down and found a small quantity of what appeared to be marijuana in Holloway's hand and a slip of paper in his pocket with the following handwritten words: "St. Paul/LA," "Northwest," "5-20 pm," "Black KCI," and "Barry." (State's Exhibit 6.) Holloway denied any knowledge about the marijuana, and he explained to the officers that he was just a bag thief. Holloway was transported to the county jail.
Further investigation by the officers revealed that Barry Williams was en route to Columbus. Officers observed Williams disembark the later flight and go to the baggage claim office with baggage tags that matched up to the two bags in question. Williams was arrested. He was also transported to the county jail, where he was confined to the same holding area as Holloway.
Williams was offered a plea agreement to a lesser charge in exchange for his testimony at Holloway's trial. Williams testified that he had been offered $1,000 to fly to Columbus with some luggage. He testified that he spoke on a cellular phone to a person named "Jerry," who Williams was supposed to meet at the Columbus airport. Jerry said that he would have dreadlocks and a Jamaican accent. Williams stated that, based on the description, he recognized Jerry in the holding cell. Williams said that he and Jerry talked in the cell. At the trial, Williams testified that Jerry was Holloway.
In his first assignment of error, Holloway argues that the trial court erred in failing to grant his motion to suppress. Holloway contends that he was subjected to an illegal detention when Detective White and Agent Allen first approached him in the airport. Holloway further contends that his detention after he fled amounted to an unlawful arrest without probable cause. Holloway argues that all evidence uncovered in the wake of these stops must be excluded as "fruit of the poisonous tree."
Upon appellate review of a motion to suppress, while this court is "bound to accept the trial court's findings of fact which are supported by competent, credible evidence, we must independently determine as a matter of law, without deference to the trial court's conclusions, whether the findings of fact satisfy the appropriate legal standard." State v. Goins (Oct. 22, 1998), Franklin App. No. 98AP-266, unreported.
Both the Ohio and the United States Constitutions protect against unreasonable searches and seizures. The Supreme Court of Ohio has interpreted Section 14, Article I of the Ohio Constitution as affording the same protection as theFourth Amendment of the United States Constitution. State v. Robinette
(1997), 80 Ohio St.3d 234, 238.
Holloway's initial contact with Detective White and Agent Allen was a lawful, consensual encounter. The United States Supreme Court has determined that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free `to disregard the police and go about his business,' * * * the encounter is consensual and * * * will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." Florida v. Bostick
(1991), 501 U.S. 429, 434. An encounter may be consensual even though the police officer identified himself, displays a badge or asks to see an airplane ticket. State v. Justice (Dec. 24, 1996), Franklin App. No. 96APA05-616, unreported.
Absent some evidence of physical force or show of authority, an encounter between police officers and a member of the public is not a seizure. United States v. Mendenhall (1980),446 U.S. 544, 553. Circumstances indicating a possible seizure include:
 "* * * [T]he threatening presence of several officers; the display of a weapon; physical touching of the person; the use of language or tone of voice indicating that compliance with the officer's request might be compelled; uniformed attire of the officer; and summoning the citizen, as opposed to approaching the citizen and identifying oneself as a law enforcement officer. * * *" * * * [State v. Trumbull (Sept. 17, 1998), Franklin App. No. 97APA12-1661, unreported, citing Mendenhall, at 554-555.]
Additional facts consistent with a show of authority include informing an individual he is suspected of illegal activity, retaining the individual's identification and asking the individual to accompany officials to their office. Florida v.Royer (1983), 460 U.S. 491, 501.
In the instant action, the undisputed evidence at the suppression hearing indicated that, when they approached Holloway in the baggage claim area, Detective White and Agent Allen were dressed in casual attire. Detective White used a conversational tone throughout the encounter. Neither officer displayed a weapon, touched Holloway or blocked his egress. They did not suggest that Holloway was suspected of unlawful activity, nor did they ask or order him to accompany them to their office. An innocent person approached in this manner would have felt free to decline the officers' request and to go about his business. The officers' initial contact with Holloway was, therefore, a consensual encounter and did not intrude upon Holloway's constitutionally protected interests of liberty or privacy.
Appellant next argues that he was unlawfully seized and arrested without probable cause after he fled from the officers. Holloway contends that the arrest occurred as soon as the officers caught him or, at the very latest, once he had been handcuffed, moved by foot as far as four hundred yards to an office in the baggage claim area, and advised of his Miranda rights. In response, the state argues that Holloway's detention was pursuant to the officers' reasonable suspicion that Holloway had committed a crime and subject to their authority to conduct an investigatory stop. Alternatively, the state contends that, following Holloway's flight, the officers had probable cause to arrest him for theft.
While we find the officers did not have probable cause to arrest Holloway when they apprehended him following his flight, the officers had cause for suspicion based on the following: Holloway had attracted attention by awkwardly handling several bags and selected the same bag that Detective White had identified; Holloway stated that he was at the airport with his uncle, yet he appeared to be alone; and Holloway had bolted after agreeing to speak with Detective White and Agent Allen.
"[N]ot all seizures of the person must be justified by probable cause to arrest for a crime." Royer, at 498. Certain seizures are constitutionally justifiable if there is a reasonable suspicion "that a person has committed or is about to commit a crime." Id. To establish the existence of reasonable suspicion for a seizure, a police officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."Terry v. Ohio (1968), 392 U.S. 1, 21.
Such an investigatory stop "must be viewed in light of the totality of the surrounding circumstances" presented to the police officer. State v. Freeman (1980), 64 Ohio St.2d 291, paragraph one of the syllabus. The standard for reviewing such police conduct is an objective one. The question is "would the facts available to the officer at the moment of the seizure * * * `warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry, at 21-22. "A court reviewing the officer's actions must give due weight to his training and view the evidence as it would be understood by those in law enforcement." State v. Carter (1994), 69 Ohio St.3d 57,65.
The totality of the circumstances in this case, including Detective White's suspicion about one of the bags Holloway ultimately retrieved, the officers' observations of Holloway's unusual behavior in selecting the bags, Holloway's comments that he was in the airport with his uncle when he appeared to be alone, and Holloway's decision to drop the bags and run, provided a reasonable, articulable suspicion that Holloway had engaged in criminal activity to justify an investigative stop. See Illinois v. Wardlow (2000), 120 S.Ct. 673, 676 ("[h]eadlong flight — wherever it occurs — is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"); Sibron v. New York (1968), 392 U.S. 40, 66
(noting that flight from law enforcement officers is a "strong indicia of mens rea"); United States v. Jones (C.A.D.C. 1992),973 F.2d 928, 931 ("[a] suspect is `free to leave' a non-seizure interview, but when he does so by abruptly bolting after having consented to talk, the officers are free to draw the natural conclusions"). Based on the totality of the circumstances surrounding the incident, we conclude that seizure of Holloway immediately following his flight from the officers was based on reasonable suspicion and, therefore, lawful.
Holloway argues that, even if the investigative stop were justified, the facts that he was handcuffed, moved three hundred to four hundred yards and read Miranda rights demonstrates that he had been arrested.
Although the "scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case[,] * * * an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Royer, at 500. Whether the stop should be deemed an arrest depends on the circumstances, including whether the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe
(1985), 470 U.S. 675, 686.
As an initial matter, we note that there was no evidence introduced at the suppression hearing or at trial that Holloway had been handcuffed when he was apprehended after his flight. Holloway raises this allegation for the first time in his appeal and, as a result, this court cannot consider that fact. See Statev. Ishmail (1978), 54 Ohio St.2d 402, paragraph one of the syllabus ("[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter").
Even if we assume, arguendo, appellant's arrest was invalid, we nonetheless conclude under the facts of this case that the evidence was properly admitted. A defendant must have standing to assert a constitutional challenge to a police search or seizure. Jones v. United States (1960), 362 U.S. 257, 261. If a defendant voluntarily abandons his property, he is without standing to challenge a subsequent search or seizure of that property. Freeman, at 296. "The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." Id. at 297. "`Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts.'" Id.
The facts in the instant matter mirror those in Freeman, where the Ohio Supreme Court concluded that a defendant had no standing to challenge the search of luggage he had abandoned. The defendant in Freeman "tried to deceive the arresting officer into believing that he would cooperate, following which [the defendant] suddenly dropped his luggage, exited through the swinging doors and fled on foot from the scene." Id. at 297-298. The Freemen
court concluded that "[a]s far as [the defendant] was concerned the luggage was bona vacantia, and, therefore, its search was proper." See, also, United States v. Torres (C.A.2, 1991),949 F.2d 606, 608 (drugs found in shoulder bag admissible on abandonment theory where defendant made repeated statements that the bag belonged to her mother and denied knowledge of its contents); United States v. Colbert (C.A.5, 1973), 474 F.2d 174,177 (defendants who disclaimed interest in briefcases had no standing to object to the search of the briefcases); Commonwealthv. Shoatz (Pa. 1976), 366 A.2d 1216, 1219 (search of suitcases permissible on abandonment theory when defendants dropped the suitcases and fled on foot when approached by the police).
In the instant action, as in Freeman, Holloway abandoned the bags when he fled from the baggage claim area. He further manifested his intent to abandon the bags when he stated in response to Detective White's request to search the bags, "I don't mind at all because they don't belong to me." (Tr. 16.) Indeed, Holloway asserted from his first encounter with the officers that the bags belonged to his uncle, and not to him. We therefore conclude that Holloway lacked standing to challenge the admissibility of the contents of the bags.
The officers' discovery of apparent marijuana inside the bags provided them with sufficient additional evidence to warrant Holloway's arrest. See United States v. Bentley (C.A.6, 1994),29 F.3d 1073, 1076 (premature arrest no grounds for suppression of evidence lawfully uncovered during investigation). We hold that, once the officers opened the abandoned bags and discovered their contents, the officers had probable cause to arrest Holloway. Holloway's detention thereafter was supported by probable cause, and evidence discovered in the subsequent search of Holloway's pockets was incident to a lawful arrest and, therefore, admissible. See State v. Miller (Sept. 22, 1992), Franklin App. No. 92AP-52, unreported (intervening lawful arrest removed taint from earlier, unlawful arrest).
For the foregoing reasons, Holloway's first assignment of error is overruled.
In his second assignment of error, Holloway asserts that his eight-year prison sentence, the mandatory term of incarceration for a drug possession conviction when the offense is a second degree felony, is unsupported by the jury's verdict. The weight of the marijuana possessed can change the degree of the offense committed from a minor misdemeanor (less than 100 grams) to a second degree felony (more than 20,000 grams). See R.C.2925.11(C)(3)(a) and (b). Holloway argues that, because the jury was not required to indicate on its verdict forms a finding as to the amount of marijuana involved at the time of the offense, the jury's verdict convicted him of a minor misdemeanor, not a second degree felony. We disagree and hold that the jury verdict was adequate to convict Holloway of a second degree felony.
As first drafted, the verdict form included a sentence that would have allowed the jury to make a special finding regarding whether the amount of marijuana exceeded 20,000 grams. Holloway's attorney objected to this language, stating that "[t]he finding of whether or not the marijuana exceeded 20,000 grams is an element of the charge, and that would be included in either a not guilty or guilty verdict." (Tr. 269.) The court noted that the jury would be instructed that a weight in excess of 20,000 grams was an element of the offense for which Holloway was indicted. The following discussion then took place:
 The Court: So your position is that if there is a guilty finding, it is a guilty finding as to the 20,000 grams?
 [Defense counsel]: I would say so because that was an element that needs to be proven. [Tr. 272.]
In their closing arguments, both parties indicated that weight in excess of 20,000 grams was an element of the alleged offense. The jury was repeatedly instructed that, before it could find Holloway guilty, it must find beyond a reasonable doubt that Holloway knowingly possessed marijuana "in an amount exceeding 20,000 grams." (Tr. 331, 337.)
Holloway's argument lacks merit for several reasons. First, he erroneously contends that R.C. 2925.03(E) and 2925.11(G) required that the jury return a finding as part of its verdict as to the amount of controlled substance involved at the time of the offense. R.C. 2925.03(E) and 2925.11(G), however, do not apply to possession cases when the controlled substance at issue is marijuana. Rather, those sections pertain to requirements in the verdict form when the defendant "is charged with possessing a bulkamount or multiple of a bulk amount" of a controlled substance. (Emphasis added.) See R.C. 2925.11(G). Marijuana is expressly excluded by the legislature from the definition of controlled substances that are measured in bulk amount. See R.C.2925.01(D)(1).
Nor, as Holloway argues, does the verdict run afoul of R.C. 2945.75(A), which provides the following in pertinent part:
 (A) When the presence of one or more additional elements makes an offense one of more serious degree:
 (1) The affidavit, complaint, indictment, or information either shall state the degree of the offense which the accused is alleged to have committed, or shall allege such additional element or elements. Otherwise, such affidavit, complaint, indictment, or information is effective to charge only the least degree of the offense.
 (2) A guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged.
Ohio courts have repeatedly found "substantial compliance with the requirements of R.C. 2945.75 in verdict forms which refer to the offenses `as charged in the indictment' when the indictment was read to the jury and/or the language of the offense was included in the charge to the jury." State v. Rakes (Dec. 30, 1997), Paulding App. No. 11-97-9, unreported. See State v. Woods (1982),8 Ohio App.3d 56, 63; State v. Corkran (1965), 3 Ohio St.2d 125, paragraph two of the syllabus; State v. Ridgeway (1972), 35 Ohio App.2d 254,256; State v. Hawkins (May 19, 1997), Portage App. No. 96-P-0213, unreported.
In the instant action, the indictment charged Holloway with a second degree felony and alleged that Holloway possessed marijuana in excess of 20,000 grams. The court instructed the jury that the indictment charged Holloway with possession of marijuana in excess of 20,000 grams and that, in order to convict, the jury must conclude beyond a reasonable doubt that Holloway knowingly possessed at least 20,000 grams of marijuana. The verdict form indicated that the jury found Holloway guilty as charged in the indictment. The colloquy between the court and defense counsel demonstrates that a guilty verdict under these circumstances meant that the jury found Holloway guilty of possession of more than 20,000 grams of marijuana.
For the foregoing reasons, Holloway's second assignment of error is overruled.
In his third assignment of error, Holloway argues that the court erred in overruling Holloway's objections to jury instructions. "A trial court * * * has discretion to determine and use its own language when incorporating legal principles in jury instructions." State v. Barnd (1993), 85 Ohio App.3d 254, 259. An appellate court considers whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion. State v. Wolons (1989), 44 Ohio St.3d 64, 68. An abuse of discretion connotes more than an error of law; it implies that the court's attitude was unreasonable, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157.
Holloway argues that the trial court erred in giving the following instruction:
 * * * The testimony of one witness that is believed by you is sufficient to prove any fact.
 If we have had some discrepancies in testimony or in the testimony of a witness or between his or her testimony and that of others, that does not necessarily mean that you should disbelieve the witness, as people will commonly forget facts or they may recollect them erroneously after the passage of time. And I am sure you are certainly all aware of the fact that two people who are witnesses to an incident may often see or hear that incident somewhat differently.
 When you are deciding about a discrepancy in a witness' testimony, you should decide whether such discrepancy concerns an important fact or a trivial fact. [Tr. 330.]
As Holloway acknowledges, however, this court has previously approved a jury instruction with virtually identical language inState v. Martin (Dec. 24, 1996), Franklin App. No. 96AP-450, unreported. See, also, State v. Scudder (Oct. 20, 1992), Franklin App. No. 91AP-506, unreported (upholding a substantially similar instruction). Because the passages at issue accurately reflect the law, we concur in our previous rulings and find no error in the instruction.
Holloway next argues that the trial court's failure to repeat the definition of reasonable doubt at the end of the jury instructions constituted error. The record demonstrates, however, that the court fully instructed the jury on the reasonable doubt standard. The court further twice advised the jury that it must find appellant guilty of all elements of the crime beyond a reasonable doubt. We conclude that the trial court instructed the jury on reasonable doubt.
Holloway's third assignment of error is, therefore, overruled.
In his fourth assignment of error, Holloway asserts that the record does not contain sufficient evidence to support his conviction and that his conviction was against the manifest weight of the evidence.
The Ohio Supreme Court outlined the role of an appellate court presented with a sufficiency of evidence argument in Statev. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime proven beyond a reasonable doubt. * * *
See, also, Jackson v. Virginia (1979), 443 U.S. 307, 319. This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172,175. Rather, the sufficiency of evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."Jackson, at 319. Accordingly, the weight given to the evidence and the credibility of witnesses are issues primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79, 80.
In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387. The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The power to reverse on "manifest weight" grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the conviction." Thompkins.
After a thorough review of the record, we conclude that the record contains sufficient evidence to support Holloway's conviction and that the conviction is not against the manifest weight of the evidence.
To prove possession of marijuana as a second degree felony, the state must show that appellant (1) knowingly possessed (2) marijuana (3) in excess of 20,000 grams. See R.C. 2925.11(A), 2925.11(C)(3)(f). Holloway contends that there is insufficient evidence in the record that he knew the suitcases contained marijuana. He further alleges that "it cannot be said with confidence that the marijuana admitted into evidence against Defendant was the same marijuana allegedly recovered at the airport on November 3, 1998." (Appellant's Brief at 22.)
We conclude that there is substantial evidence in the record on both elements. "A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C.2901.22(B). In this case, Barry Williams testified at trial that he knew there was something nefarious about the contents of the bags and that he was to deliver the bags to Holloway. Holloway's flight from the officers and his use of a false name provides further circumstantial evidence that Holloway had knowledge of the contents of the bags. See State v. Eaton (1969), 19 Ohio St.2d 145, paragraph six of the syllabus.
Similarly, the record contains ample evidence that the marijuana introduced at trial came from the bags at issue. The contents of the bags were logged in by Detective White and bore the same property number as the bundles examined by the state's expert chemist, Heather Crock, and introduced as evidence at trial. Holloway argues that a change in weight from 33,000 grams recorded by Detective White to the 26,264 grams recorded by Crock demonstrates that the bundles examined by Crock were not the same as the bundles taken from the luggage. This argument is unavailing; Detective White testified that he recorded a gross weight including all packaging and Crock testified that she only weighed the unpackaged contents of the bundles. Moreover, Crock noted that marijuana, like all vegetation, loses weight over time, and nearly a year lapsed between the weighings.
For the foregoing reasons, Holloway's fourth assignment of error is overruled.
In his fifth assignment of error, Holloway contends that the trial court erred by refusing to allow Holloway to withdraw his guilty plea to the unrelated charge of attempting to carry a concealed weapon.
On November 5, 1998, two days after his arrest on the drug possession charge, Holloway was indicted on one count of carrying a concealed weapon, a fourth degree felony. On February 23, 1999, Holloway pled guilty to attempt to carry a concealed weapon, a felony of the fifth degree. The sentencing on this plea was repeatedly continued to await the outcome of the drug possession trial.
Immediately following his conviction for drug possession, Holloway moved to withdraw his plea on the weapons charge. At his sentencing hearing three days later, counsel argued that Holloway had entered the plea on the probability that he would receive probation on the weapons charge, a belief that was undermined by Holloway's conviction for drug possession. On appeal, Holloway argues that his motion should have been granted because, at the time he entered his plea, he was not aware that he had been indicted on the drug possession offense. It is undisputed, however, that Holloway knew about his indictment on the drug charge more than eight months before he moved to withdraw his guilty plea.
A defendant does not have an absolute right to withdraw a guilty plea before sentencing. State v. Xie (1992), 62 Ohio St.3d 521, paragraph one of the syllabus. "The decision to grant or deny a presentence motion to withdraw a guilty plea is within the sound discretion of the trial court." Id. at paragraph two of the syllabus. On appeal, the exercise of such discretion will be reversed only if the trial court's ruling was unreasonable, arbitrary or unconscionable. Id. at 527. The trial court does not abuse its discretion in overruling a motion to withdraw a guilty plea where: (1) the accused is represented by highly competent counsel; (2) the accused was afforded a full hearing before he entered his plea; (3) the accused is given a hearing on the motion to withdraw; and (4) the record demonstrates that the court fairly considered the motion to withdraw. State v. Wyke
(Apr. 8, 1993), Franklin App. No. 92AP-1137, unreported.
Although Holloway did not provide this court with the transcript of his guilty plea hearing, he has not suggested that he was improperly represented at the time he gave his plea or that his plea hearing was in any way deficient. After a thorough review of the record, we conclude that, on December 6, 1999, Holloway received a hearing on his motion to withdraw his plea. The record demonstrates that the trial court fairly considered Holloway's motion and exercised sound discretion in denying the motion. See State v. Lambros (1988), 44 Ohio App.3d 102, 103
(noting that a defendant cannot withdraw his plea merely because he has changed his mind or because he has learned that he will receive a harsher sentence than he had subjectively expected).
Holloway's fifth assignment of error is overruled.
In his sixth assignment of error, Holloway argues that he was denied the effective assistance of trial counsel.[1]
In State v. Ballew (1996), 76 Ohio St.3d 244, 255, the Ohio Supreme Court outlined the following test regarding ineffective assistance of counsel:
 Reversal of a conviction or sentence based upon ineffective assistance requires (a) deficient performance, "errors so serious that counsel was not functioning as the `counsel' guaranteed the defense by the Sixth Amendment," and (b) prejudice, "errors * * * so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington (1984), 466 U.S. 668, 687 * * *.
"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland v. Washington (1984), 466 U.S. 668, at 689. Furthermore, "the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id.
Holloway asserts that his trial counsel failed to effectively argue the motion to suppress, leading to improper admission of evidence. Holloway concedes, however, that "[t]he likelihood of success on the merits of the motion to dismiss can be assessed through this court's consideration of the first assignment of error herein." (Appellant's Brief at 24.) Because this court has already concluded that the motion to suppress was properly denied, we cannot find that Holloway's trial counsel performed deficiently or committed prejudicial error in arguing the motion.
Holloway next contends that his trial counsel was ineffective because she failed to object to the introduction into evidence of the marijuana, impairing her ability to argue a chain of custody issue to the jury. The record reveals, however, that, in her cross-examinations of Detective White and Heather Crock, trial counsel raised the specter that the marijuana examined by the state's chemist might not have been the same material removed from the luggage. Trial counsel made a conscious decision not to call the state's records custodian, who was available to testify. Trial counsel may have reasonably believed that the records custodian would have only bolstered the evidence for the state and negated the impact of her cross-examinations. In light of these circumstances, we find that trial counsel's actions may be considered sound trial strategy and, therefore, do not constitute deficient performance.
Holloway also asserts that his trial counsel was ineffective in her decision to seek a continuance in order to allow Barry Williams to testify at trial. We cannot agree. First, the record does not indicate what Williams was telling Holloway's counsel at the time she requested the continuance. Moreover, the record demonstrates that, in her cross-examination of Williams, trial counsel established that Williams never met Holloway prior to November 3, 1998, bolstering her argument that Holloway merely tried to steal Williams' bags and was not involved in the plan to transport drugs.
Finally, Holloway contends that his trial counsel ineffectively portrayed him as a bag thief. We conclude that counsel was exercising sound trial strategy, offering the jury an explanation that would have spared Holloway a conviction for the drug possession offense.
In sum, we find that Holloway failed to demonstrate that his counsel performed deficiently or that he suffered prejudice as a result of his counsel's performance. Accordingly, we overrule Holloway's sixth assignment of error.
Because we have overruled each of Holloway's specific assignments of error, we likewise overrule his seventh assignment of error, in which Holloway argues that the cumulative effect of error deprived him of his right to a fair trial.
For the foregoing reasons, Holloway's assignments of error are overruled. Accordingly, the judgments of the Franklin County Court of Common Pleas are affirmed.
[1] On appeal, Holloway is represented by different counsel than at trial.