{¶ 41} Although I agree with its final determination, I must respectfully disagree with the majority's disposition of this case and its characterization of the facts. Based upon my view of the underlying facts, I would conclude there existed no probable cause for arrest at the scene of the accident thus making the arrest illegal. However, I would still affirm the judgment of the trial court since the illegal arrest did not invalidate the subsequent conviction. Because the officer had reasonable suspicion to detain Blake and transport him to safer conditions in order to conduct the field sobriety tests, the evidence gathered subsequent to the arrest would not be subject to suppression.
 {¶ 42} The majority emphasizes the cause of the accident was Blake's operation of his vehicle while under the influence of alcohol. However, this accident is not the type contemplated by cases such asFairfield v. Regner (1985), 23 Ohio App.3d 79, 491 N.E.2d 333. Blake's alleged failure to initiate the parking brake simply is not enough to establish either that Blake had been drinking or that his driving was impaired. This is true especially when the outside temperature is between three and six degrees and the only other physical signs of intoxication are the defendant's red glassy eyes and flushed skin.
 {¶ 43} Furthermore, Blake never admitted to drinking immediately prior to the accident. Blake clearly explained to the officers he had been drinking the night before. Because the arrest had taken place at around 7:00 A.M., Blake could have had the opportunity to sober up. Consequently, when these facts are taken as a whole, I do not conclude they support a finding of probable cause. However, I readily concede they would create reasonable suspicion in the mind of an investigating officer.
 {¶ 44} This brings me to the reason why the lack of probable cause is not fatal to Blake's conviction. Even if Blake's arrest at the accident scene was illegal due to lack of probable cause, this conclusion does not, in an of itself, require the reversal of his conviction. "[A]n illegal arrest does not invalidate a subsequent conviction which is otherwise proper." State v. Henderson (1990), 51 Ohio St.3d 54, 56,554 N.E.2d 104; Gerstein v. Pugh (1975), 420 U.S. 103, 119,95 S.Ct. 854, 43 L.Ed.2d 54. Furthermore, an illegal arrest does not automatically require the suppression of all evidence acquired after the arrest. Brownv. Illinois (1975), 422 U.S. 590, 599, 95 S.Ct. 2254, 45 L.Ed.2d 416. Only evidence that is directly derived from that illegal arrest must be suppressed. Henderson, supra at 56; Mapp v. Ohio (1961), 367 U.S. 643,81 S.Ct. 1684, 6 L.Ed.2d 1081. If the challenged evidence was not acquired by exploiting a prior illegal government activity, then the exclusionary rule does not apply. Wong Sun v. United States (1963), 371 U.S. 471,488, 83 S.Ct. 407, 9 L.Ed.2d 441.
 {¶ 45} The United States Supreme Court has held that the exclusionary rule does not apply to evidence obtained subsequent to an illegal arrest if the evidence was obtained while the defendant was otherwise in legal custody, and if there are no other legal impediments to using the evidence. New York v. Harris (1990), 495 U.S. 14, 19-20,110 S.Ct. 1640, 109 L.Ed.2d 13.
 {¶ 46} In United States v. Bentley (C.A.6, 1994), 29 F.3d 1073, the Sixth Circuit Court of Appeals refused to suppress evidence obtained immediately after an illegal arrest. In Bentley, agents of the Bureau of Alcohol, Tobacco Firearms ("ATF") stopped the defendants' vehicle and immediately handcuffed them and put them in the back of a police cruiser. The ATF agents then approached their vehicle and observed a variety of firearms and firearm boxes, which the agents collected as evidence.
 {¶ 47} The defendants filed a motion to suppress the evidence found in the vehicle. The Bentley court held that the arrest was not supported by probable cause. Id. at 1075. Nevertheless, the court held that there were independent reasons to justify the search of the vehicle and the seizure of evidence apart from the illegal arrest. Id. The court found that the original stop of the vehicle was constitutionally permissible under Terry v. Ohio (1968), 392 U.S. 1, 21, 88 S.Ct. 1868,20 L.Ed.2d 889, and that the guns were discovered pursuant to the plain view doctrine. Id. at 1075-1076. Because these independent reasons justified the manner in which the government acquired the evidence, the court held that, "the premature arrest played no role in the seizing of the evidence * * *." Id. at 1076. Accord United States v. Eylicio-Montoya (C.A.10, 1995), 70 F.3d 1158, 1167; cf. People v. Tariq (1991), 170 A.D.2d 716,565 N.Y.S.2d 614 (statements made at police station were not the fruit of illegal arrest where detention in police station was otherwise legal); see also People v. Monson (1967), 255 Cal.App.2d 689 (trial court is free to infer that legal Terry stop, rather than illegal arrest, was the basis for police acquiring evidence).
 {¶ 48} Blake does not appear to dispute that the results of the field sobriety tests provided ample probable cause to arrest him. Therefore, we will review whether Trooper Oaks legally detained Appellant for the purpose of administering field sobriety tests. If Appellant was otherwise legally detained, the results of that detention do not need to be suppressed based on Harris and Bentley.
 {¶ 49} An officer may detain a person for a reasonable amount of time in order to administer field sobriety tests if there is a, "reasonable, and articulable suspicion justifying prolonging the detention at that point to administer field sobriety tests." State v.Frady (2001), 142 Ohio App.3d 776, 781, 757 N.E.2d 12; State v. Boys
(1998), 128 Ohio App.3d 640, 643, 716 N.E.2d 273. "Probable cause is not needed before an officer conducts field sobriety tests." Columbus v.Anderson (1991), 74 Ohio App.3d 768, 770, 600 N.E.2d 712.
 {¶ 50} The following factors, quoted from State v. Evans (1998),127 Ohio App.3d 56, 711 N.E.2d 761, may be used to determine whether there was reasonable suspicion to conduct field sobriety tests:
 {¶ 51} "Without citing the numerous cases which have been canvassed, it may be said these factors include, but are not limited to: (1) the time and day of the stop (Friday or Saturday night as opposed to, e.g., Tuesday morning); (2) the location of the stop (whether near establishments selling alcohol); (3) any indicia of erratic driving before the stop that may indicate a lack of coordination (speeding, weaving, unusual braking, etc.); (4) whether there is a cognizable report that the driver may be intoxicated; (5) the condition of the suspect's eyes (bloodshot, glassy, glazed, etc.); (6) impairments of the suspect's ability to speak (slurred speech, overly deliberate speech, etc.); (7) the odor of alcohol coming from the interior of the car, or, more significantly, on the suspect's person or breath; (8) the intensity of that odor, as described by the officer (`very strong,' `strong,' `moderate,' `slight,' etc.); (9) the suspect's demeanor (belligerent, uncooperative, etc.); (10) any actions by the suspect after the stop that might indicate a lack of coordination (dropping keys, falling over, fumbling for a wallet, etc.); and (11) the suspect's admission of alcohol consumption, the number of drinks had, and the amount of time in which they were consumed, if given. All of these factors, together with the officer's previous experience in dealing with drunken drivers, may be taken into account by a reviewing court in determining whether the officer acted reasonably. No single factor is determinative." Id. at 64 fn. 4.
 {¶ 52} Many of the Evans factors appear in this case: Appellant's red and glassy eyes; his flushed face; his admission that he consumed a large amount of alcohol; and the early Saturday morning timing of the incident, following an admitted Friday night binge. These facts more sufficiently support a reasonable suspicion of DUI such that field sobriety tests could be administered.
 {¶ 53} The next question is whether Trooper Oaks kept Blake detained only as long as was necessary to conduct the field sobriety tests. An officer is not always required to conduct field sobriety tests where the initial stop occurred. Wickliffe v. Gutauckas (1992),79 Ohio App.3d 224, 227, 607 N.E.2d 54. The propriety of a defendant's continued detention so that field sobriety tests may be performed is reviewed in the light of the totality of circumstances surrounding the detention. See this Court's decision in State v. Blackburn (1996),115 Ohio App.3d 678, 681, 685 N.E.2d 1327; cf. State v. Bobo (1988),37 Ohio St.3d 177, 524 N.E.2d 489, paragraph one of syllabus.
 {¶ 54} Trooper Oaks testified that it was very cold outside and that he was planning on taking Blake to the Highway Patrol post for two reasons: 1) to conduct field sobriety tests; and 2) to have someone come and pick up Blake. It is clear Blake could not drive himself anywhere because of the automobile accident. The actions taken by Trooper Oaks all seem reasonable given the circumstances. It is unreasonable to believe that Trooper Oaks would force Blake to stand out in 3-6 degree temperature to take field sobriety tests, or would leave Blake stranded at the side of the highway with no means of transportation. Therefore, it would appear that Blake could and perhaps should have continued to be in legal detention at the time that field sobriety tests were administered. The field sobriety test evidence was not gathered pursuant to the illegal arrest, but rather, pursuant to the legal Terry stop, which led to information justifying further detention so that field sobriety tests could be administered.
 {¶ 55} There seems to be no question that Blake failed all six field sobriety tests. Poor performance on field sobriety tests is an effective means of determining intoxication, and is often a key factor in establishing probable cause to arrest for DUI. Homan, supra,89 Ohio St.3d at 425; State v. Bresson (1990), 51 Ohio St.3d 123, 129,554 N.E.2d 1330; Lloyd, supra, 126 Ohio App.3d at 95; State v. Antill
(1993), 91 Ohio App.3d 589, 595, 632 N.E.2d 1370. There is no doubt that, after the field sobriety tests were administered, the troopers had probable cause to arrest Blake. The record shows that it was only after the field sobriety tests were administered that Blake was formally arrested. Consequently, even though there was an initial arrest, done without probable cause, based on the foregoing analysis the formal arrest at the Highway Patrol post was supported by probable cause.
 {¶ 56} For the foregoing reasons, I concur in judgment only.